```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
```

CHARLES E. HATHAWAY,

                                      **DECISION AND ORDER**
        Petitioner,                **No. 09-CV-0738T**

   -vs-

JOHN BURGE,
SUPERINTENDENT

        Respondent.

_____

## I.   Introduction

*Pro se* Petitioner Charles E. Hathaway("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered November 23, 2004, in New York State, Supreme Court, Monroe County (Joseph D. Valentino, J.), convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25 [1]) and Criminal Possession of a Weapon in the Second Degree (Penal Law former § 265.03 [2]).  Petitioner was sentenced to an indeterminate term of imprisonment of twenty-five years to life.

    For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.   Factual Background and Procedural History

    The charges arise from a shooting incident that occurred on September 22, 2002 near 700 South Plymouth Avenue in Rochester,

New York, wherein Bruce Coley ("Coley") was killed by a gunshot wound to the head.

Sakin Mohamed ("Mohamed"), the sole eyewitness to the crime, testified that on September 22, 2002, at approximately 1:10 a.m., he was sitting on the balcony above the store where he worked at 675 South Plymouth. Trial Trans. [T.T.] 635, 637. From this vantage point, he could see the parking lot of a Sunoco gas station where Coley, whom he knew as "Dees," was riding a bicycle. T.T. 639, 640, 722. Mohamed saw Petitioner come from between two buildings and begin shooting at Coley. T.T. 641, 643. Coley tried to escape in a van that was at the gas station, but he was shot while in the van. T.T. 643-644. Coley then got out of the van, at which point he was shot once again and fell to the ground. T.T. 644. Mohamed recognized Petitioner as a customer at his store, whom he knew as "7-Up." T.T. 650, 722-723.

On the day of the crime, Rochester Police Investigator John Dianni met with Mohamed and conducted two identification procedures. Hr'g Mins. [H.M.] of 05/19/04 18-19.[1] First, Investigator Dianni performed a "general MoRIS query," whereby he entered the suspect's description into a computer system that then, one at a time, displayed images of people who had been arrested and

---

[1] A <u>Wade/Huntley</u> hearing was held over the course of several days starting on May 19, 2004 and continuing to June 22, 2004. Developments, which are discussed in further detail below, relating to Mohamed's identification between then and the trial resulted in additional hearing proceedings in October 2004.

who matched that description. H.M. of 05/19/04 19. Mohamed viewed approximately 200 photographs in the MoRIS query, but did not identify the perpetrator in any of them. H.M. of 05/19/04 19, 30.

Mohamed then told Investigator Dianni that the perpetrator was a customer at the store where he worked, whom he knew as "7-Up." H.M. of 05/19/04 20, 32, 37. Investigator Dianni then searched another database for the moniker "7-Up," obtained the name of a possible suspect, and then included that person's photograph into a photo array. H.M. of 05/19/04 20, 33. Investigator Dianni showed Mohamed the array, telling him that the person he saw shoot Coley "may or may not be within the array, but just look at it." H.M. of 05/19/04 21. The array had six photographs, matching the description of a "male black, 6'3", approximately 250" in the range of 20-25 years old. H.M. of 05/19/04 21. Investigator Dianni did not speak to Mohamed as he viewed the array or suggest which photograph Mohammed should pick. H.M. of 05/19/04 22. Mohammed picked out Petitioner's photograph and stated that he was "7-Up," the man he saw shoot Cooley. H.M. of 05/19/04 22-23, 36.

When Petitioner was brought in for questioning almost one year later, on August 8, 2003, he waived his <u>Miranda</u> rights and spoke with investigators. H.M. of 05/19/04 67-68; H.M. of 06/22/04 13-15. Petitioner gave a written statement to police in which he admitted that, at approximately 11:00 p.m. the night before the shooting, he had an argument with Coley because they were both

selling marijuana in the area. Petitioner claimed that Coley hit him from behind, causing him to fall to the ground and lose consciousness. T.T. 795. According to Petitioner, after he regained consciousness, he left, went home to bed, and woke up the next morning. T.T. 795-796. The next day, he left for Gary, Indiana. Petitioner claimed that he was not involved in the shooting and that he avoided contact with the police because he "thought [he] had a warrant for a child custody issue." T.T. 796.

At trial, Mohamed identified Petitioner in court as the shooter. T.T. 651. However, between his original identification of Petitioner as the perpetrator on the date of the shooting and his identification of Petitioner at trial, Mohamed vacillated, as discussed below, with respect to Petitioner's identity as the shooter.

### The April 16, 2004 Letter to ADA Splain

By letter dated April 16, 2004, Mohamed told ADA Kristin Splain "that he wasn't sure anymore about who did the shooting. And then, upon further questioning with Ms. Splain, he indicated he was scared." Mins. of 10/7/04 3; see also Resp't App. C at 45. Thereafter, ADA Splain requested a protective order to prevent disclosure to the defense of Mohamed's personal information on the basis that he was "petrified" of Petitioner. T.T. of 05/11/04 14; H.M. of 05/19/04 8, 13.

### The October 5, 2004 Discussion with ADA Chase

On October 5, 2004, Mohamed came to the office of Assistant District Attorney Ann Chase, who had taken over the prosecution from ADA Splain, to discuss the upcoming trial.  Mohamed told ADA Chase that the perpetrator had come into his store four days earlier and the person he identified in the photo array looked like the perpetrator but was not him because the perpetrator was not in jail.  T.T. of 10/7/04 4;  see also Resp't App. C at 46.

### The October 8, 2004 Line-Up

On October 8, 2004, ADA Chase arranged for Mohamed to view a lineup that included Petitioner.  T.T. of 10/8/04 7.  Mohamed did not pick anyone out of the lineup.  T.T. of 10/12/04 2.  On October 12, 2004, the People requested an adjournment of one day to discuss the matter with Mohamed on the basis that Mohamed was "indicating that the reason he gave the information last week in connection with the interview with Ms. Chase and the line-up was that he was scared.  He's currently indicating that [Petitioner] was, in fact, the individual he saw do the killing."  T.T. of 10/12/04 9.  The court granted the adjournment.  T.T. of 10/12/04 13.

### The Events Following the October 8, 2004 Lineup

On October 13, 2004, in open court, the prosecutor stated, "last night we spent time  with the witness, Sakin Mohamed, as well as with an Arabic interpreter.  This is the first time that an

Arabic interpreter has been used in conversations with Mr. Mohamed. Based on conversations with Mr. Mohamed through the interpreter, we are confident that the witness is telling the truth about what happened on September 22, 2002." T.T. of 10/13/04 3-4. The defense then requested an extension of the Wade hearing to address the contact between Mohamed and law enforcement after the line-up. T.T. of 10/13/04 13.

### The Supplemental Wade Hearing

At the supplemental Wade hearing, Investigator Weather testified that he was present on October 8, 2004, when Mohamed viewed a line-up at the Sheriff's Office. H.M. of 10/13/04 6-7. Each of six individuals approached the one-way glass, "making quarter turns until they completed a full turn and then returned to their position in line." H.M. of 10/13/04 8-9. Mohamed viewed the lineup and then asked for Number 2 to come forward again. H.M. of 10/13/04 10. Investigator Galetta asked if Mohamed recognized anyone in the lineup and Mohamed said "no, not really." H.M. of 10/13/04 10. Petitioner was Number 3 in the lineup. H.M. of 10/13/04 10, 11. The defense stipulated that the lineup was not unduly suggestive. H.M. of 10/13/04 57.

Investigator Weather met with Mohamed on October 12, 2004, in ADA Chase's Office. H.M. of 10/13/04 12. Investigator Weather had been told that, earlier that day, Mohamed had given "conflicting accounts of some information regarding the line-up." H.M. of

10/13/04 12.  Investigator Weather "explained to [Mohamed] that he needed to be completely honest with both [ADA Chase and him] and be truthful.  It didn't matter what the truth was; [they] just need to hear from him what he actually knew about this case."  H.M. of 10/13/04 12.  Mohamed then "admit[ted] that he asked to see Number 2 again, but that he thought it might be Number 3."  H.M. of 10/13/04 13.

Later that evening, Investigator Weather met Mohamed again at the Public Safety Building.  H.M. of 10/13/04 13.  Through an interpreter, Investigator Weather explained to Mohamed that he was "unable to ascertain the reasons he was vacillating from his original account of what had happened until [sic] the account from yesterday that [they] learned."  H.M. of 10/13/04 14.  Through the interpreter, Mohamed said that he had lied about two things: "that he saw [sic] the individual he identified earlier in his store four days prior to the lineup, and that he told us that he didn't recognize anyone in the lineup. He said, to his God, it was Number 3; I knew it all along.  That he was scared to tell [them].  He was afraid that this individual was going to come to his store with his friends or have his friends come to the store and harm him or his family."  H.M. of 10/13/04 15-16.

Mohamed testified that he had no further conversation about the October 8, 2004 lineup after it took place.  H.M. of 10/14/04 34.  On October 9, 10, and 11, he did not speak with anyone from

law enforcement about the lineup or about the case.  H.M. of 10/14/04 35-36.  On October 12, 2004, he was brought to the police station by a man who indicated to Mohamed that he knew nothing about the case.  H.M. of 10/14/04 37.  The only other conversation he recalled having with this man about the case consisted of him admitting to the man that he was "anxious" and "a lot tense" about the approaching trial, but that he was "here now to say everything and the truth."  H.M. of 10/14/04  37, 51.  Mohamed then met with ADA Chase and Investigator Weather at ADA Chase's office.  H.M. of 10/14/04 40-41.  At that time, Mohamed told Investigator Weather that, although he said it was Number 2 in the October 8, 2004 lineup, it was really Number 3.  H.M. of 10/14/04 Vol. 4 41-42.  When asked why he had said this, he explained that he was "very, very tense and anxious with the line-up."  H.M. of 10/14/04 42.  Mohamed testified that he further explained to Investigator Weather that, when he realized that he was the only witness who had come forward, his religious duty as a Muslim demanded that he witness it.  H.M. of 10/14/04 43, 53-54, 62.

Later that day, Investigator Weather took Mohamed back to the police department and they spoke through an interpreter.  H.M. of 10/14/04 44-45.  Investigator Weather explained that he wanted Mohamed "to say only the truth."  H.M. of 10/14/04 45.  Mohamed again explained that he had misidentified Number 2 in the lineup and "did it on purpose."  H.M. of 10/14/04 45.  Mohamed testified

that he was never threatened in any way to change his mind about what he had seen in the lineup. H.M. of 10/14/04 46.

At the close of the supplemental Wade hearing, the court determined that there was no undue suggestiveness and therefore denied Petitioner's motion to preclude Mohamed's in-court identification. H.M. of 10/14/04 70.

A jury trial was conducted before Judge Valentino over the course of a six-day period. At the close of the trial, Petitioner was found guilty of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. T.T. 1014. Petitioner was sentenced to an indeterminate term of imprisonment of twenty-five years to life on the murder conviction, and a determinate term of fifteen years with five years of post-release supervision on the weapons conviction. Sentencing Mins. [S.M.] 16-17.

Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department, which was unanimously affirmed on October 3, 2008. People v. Hathaway, 55 A.D.3d 1286 (4th Dep't 2008); lv. denied, 11 N.Y.3d 925 (2009).

No collateral motions were filed.

This habeas corpus petition followed, wherein Petitioner seeks relief on the basis that "[his] conviction was obtained through unreliable and unnecessarily suggestive prior identification

procedures and pressure upon the single identification witness, that violated [his] due process." Pet. ¶ 22A (Dkt. No. 1).

### III. General Principles Applicable to Habeas Review

#### A. The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan

v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003). A state

court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

### B.  Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), cert. denied, 464 U.S. 1048 (1984).

## IV. Petitioner's Claim

Petitioner contends, as he did on direct appeal, that "[his] conviction was obtained through unreliable and unnecessarily suggestive prior identification procedures and pressure upon the single identification witness, that violated [his] due process." Specifically, he claims that the conduct of the police and the prosecutor after the October 8, 2004 line-up was unduly

suggestive.[2]  See Pet. ¶ 22A; see also Pet'r Br. on Appeal.  In a detailed, thorough explanation and review of the record on appeal, the Appellate Division, Fourth Department rejected this claim on the merits.  See Hathaway, 55 A.D.3d at 1287-1288.  As discussed below, this claim is meritless.

A pre-trial identification is only inadmissible as unduly suggestive if it was so unreliable as to raise "a very substantial likelihood of irreparable misidentification."  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  Thus, the admission of testimony concerning a suggestive identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability.  Id. at 114.  Moreover, "[e]ven an impermissibly suggestive pre-trial identification procedure does not render an identification inadmissible in court if, considering the totality of the circumstances, there is sufficient evidence of reliability apart from the tainted identification."  Ortiz v. Artuz, 113 F. Supp. 2d 327, 337 (E.D.N.Y. 2000).  If there is such evidence, "the identification is admissible independent of the suggestive nature of the pretrial identification."  Id., citing Manson, 432 U.S. 98; Neil v. Biggers, 409 U.S. 188 (1972); see Dickerson v. Fogg, 692 F.2d 238, 244 (2d Cir. 1982) ("Even grossly

---

[2] Petitioner does not flesh out this claim or cite supporting facts in the habeas petition. Rather, he attaches the fact portion of his appellate brief to the habeas petition with a notation to "see statement of facts, attached." Pet. ¶ 22A. Liberally construing Petitioner's *pro se* pleadings, the Court understands this to mean that Petitioner wishes to raise the same claim in the instant habeas petition that he raised on direct appeal.

suggestive procedures will not require suppression of a witness'[s] identification testimony if it is clearly reliable, independent of improper procedures.") (citation and internal quotation marks omitted). Five factors to be considered as independent indicia of the reliability of a witness's identification are: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time elapsed between the crime and the confrontation. Manson, 432 U.S. at 114. In addition, prior familiarity of the witness with the accused is an important indication of the reliability of the pre-trial identification. See Ortiz, 113 F. Supp. 2d at 337; accord Minetos v. Scully, 625 F.Supp. 815, 819 (S.D.N.Y. 1986).

In this case, after conducting a supplemental Wade hearing in which Investigator Weather and Mohamed testified extensively to the occurrences of October 8-12, 2004, Judge Valentino determined that "there was a lack of suggestivity in all instances" and denied Petitioner's motion to suppress Mohamed's in-court identification. H.M. of 10/14/04 69-70. On direct appeal, the Appellate Division, Fourth Department affirmed the suppression court's determination, and found, in relevant part, that: "[T]hat the People met their initial burden of establishing that the actions of the prosecutor and the police were not unduly suggestive." Hathaway, 55 A.D.3d at

1288. This Court finds no basis to disturb the determination of the state courts. The testimony from the supplemental Wade hearing established that Investigator Weather met with Mohamed after the October 8, 2004 line-up for purposes of understanding why he had vacillated from his original account. At that time, Investigator Weather indicated to Mohamed that he must be honest and truthful, regardless of what the truth was. Mohamed testified that he was not pressured by anyone, that he had lied when he failed to identify Petitioner at the October 8, 2004 line-up, and that he had known all along that Petitioner was the killer. Nothing suggests that the police or the prosecutor acted improperly or made any suggestions whatsoever to Mohamed that Petitioner was the perpetrator of the crime after the October 8, 2004 line-up. Rather, their actions after the October 8, 2004 line-up were aimed at ascertaining why Mohamed had vacillated from his original account, without suggesting what his answer should be. Moreover, the testimony from the supplemental Wade hearing also established that it was first fear and then a sense of religious obligation to tell the truth that caused Mohamed to vacillate from his original account, not, as Petitioner speculates, undue pressure from the police and the prosecution.

In any event, even if the conduct of the police and the prosecutor was improperly suggestive -- a finding which this Court does not make -- Mohamed's identification was independently

reliable.³ The Supreme Court has directed that "the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 200.

Here, none of the Biggers factors weigh against reliability. Mohamed had a clear view of the crime and watched it from beginning to end from an elevated balcony across the street. T.T. 639-644. Mohamed was able to give a physical description of the perpetrator to police and he was also able to identify the perpetrator by his by his street name ("7-Up"). Mohamed was presented with the photo array on the same day that the crime occurred and expressed no doubt about the identity of Petitioner as the shooter. When evaluated in light of the "totality of the circumstances," the witness's identification was reliable. Biggers, 409 U.S. at 199-200.

Accordingly, Petitioner's claim provides no basis for habeas relief. The state court's adjudication of this claim did not

---

³ The Appellate Division, Fourth Department alternatively held that Mohamed's prior familiarity with Petitioner, whom Mohamed knew by his street name as "7-Up," demonstrated "that there was no risk that any subsequent action by the prosecutor or the police could lead to a misidentification." Hathaway, 55 A.D.3d at 1288.

contravene or unreasonably apply settled Supreme Court law. The claim is therefore dismissed in its entirety.

## V. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

               S/Michael A. Telesca
               HONORABLE MICHAEL A. TELESCA
               United States District Judge

DATED:  June 28, 2011
      Rochester, New York